UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

OCTAVIUS JORDAN,

              Plaintiff,

    v.                                  Case No. 19-cv-1314-pp

WARDEN SCOTT ECKSTEIN, STEVE SCHUELER,
JOHN KIND, JON LITSCHER,
CATHY JESS, STEPHANIE CUMMINGS,
JENNIFER HARRIS-FORBES, ALAN DEGROOT,
EMILY DAVIDSON, CINDY O'DONNELL,
JAMES GREER and DR. MARLENA LARSON,

              Defendants.

---

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DKT. NO. 71), GRANTING PLAINTIFF'S MOTION TO OBTAIN COPIES OF ALL DOCUMENTS FILED IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT (DKT. NO. 107), GRANTING PLAINTIFF'S MOTION TO HAVE SIGNATURE ADDED (DKT. NO. 108) AND DISMISSING CASE**

---

Octavius Jordan, who is incarcerated and is representing himself, filed this civil rights case under 42 U.S.C. §1983. Dkt. No. 1. The plaintiff alleges that when he started at Badger State Industries at Green Bay Correctional Institution, he moved from a cell hall into dorm; when the dorm setting started to interfere with his mental health condition, the defendants refused to move him out of the dorm, and he eventually attempted suicide. The plaintiff is proceeding on a claim that the defendants' refusal to treat his mental health condition by moving him out of the dorm violated his rights under the Eighth

1

Amendment.[1] Dkt. No. 10 at 15-16. This order grants the defendants' motion for summary judgment, grants the plaintiff's motions for copies and to add a signature page, and dismisses this case.

## I. Procedural Background and Plaintiff's Motions

The defendants filed their motion for summary judgment on June 13, 2022. Dkt. No. 71. The court granted the plaintiff's motions for additional time to respond to the defendants' motion. Dkt. Nos. 76, 78, 81, 83, 85, 87. On March 31, 2023, the court received from the plaintiff an unsigned response to the defendants' proposed findings of fact 1-37 (Dkt. No. 90), an unsigned "Motion of Opposition to Defendant's Motion for Summary Judgment" (Dkt. No. 89) (which court staff docketed as a brief in opposition), and "Motion to Submit Opposition to Defendants Motion for Summary Judgment in Parts" (Dkt. No. 88). The court granted the plaintiff's motion to file his response "in parts" and gave him a deadline of April 19, 2023 by which to have all the "parts" of his opposition brief filed. Dkt. No. 91. The plaintiff timely filed his (unsigned) response to the defendants' proposed findings of fact 38-122 (Dkt. No. 92); declarations from himself (Dkt. No. 93), James Blunt (Dkt. No. 94), Terrell Essex (Dkt. No. 95), Gregory Tucker (Dkt. No. 96) and Calvin Pirtle (Dkt. No. 97); and an affidavit from Christopher Smith (Dkt. No. 98). He also filed a

---

[1] On April 27, 2021, the court granted the defendants' motion for partial summary judgment on exhaustion grounds and dismissed the plaintiff's other claim, which was based on allegations that defendants Wickman and Kind had punished the plaintiff for his mental breakdown by issuing him a false charge and keeping him in temporary lock-up status for twelve days after his suicide attempt. Dkt. No. 26.

motion for a five-day extension of time to file his summary judgment response brief. Dkt. No. 99. The court granted the motion for an extension of time, dkt. no. 100, and the plaintiff timely filed his brief, dkt. no. 101.

On April 26, 2023, the Clerk of Court sent the plaintiff a letter directing that within twenty-one days, he must file a signature page for his responses to the defendants' proposed findings of fact (Dkt. Nos. 90, 92). Dkt. No. 102. Three months later—on July 25, 2023—the court received from the plaintiff a motion to have "signature and conclusion" added to his responses and brief.[2] Dkt. No. 108. The motion says that the plaintiff previously submitted his signature page, as directed, and asserts that if the court did not receive it, staff threw it away. Id. The court will direct the clerk's office to file the plaintiff's motion as signature pages to his proposed findings of fact and motion of opposition to defendants' motion for summary judgment (Dkt. Nos. 89, 90, 92).[3]

The plaintiff also has filed a motion to obtain copies of all documents filed in opposition to defendants' motion for summary judgment. Dkt. No. 107. He says that he previously informed the court that he lacked funds to have copies made before mailing his documents to the court and that he asked the

---

[2] The plaintiff's brief in opposition to defendants' motion for summary judgment is signed. Dkt. No. 101. The court assumes the plaintiff was referring to his "motion of opposition," which the clerk's office docketed as a "brief in opposition." Dkt. No. 89.

[3] The plaintiff references having his "signature and conclusion" added to these documents. It is not clear what he means by "conclusion" and the court assumes that the conclusion is part of the date and signature portion of the filing.

3

court for copies in April or May, 2023, but that he never received them. Id. On April 27, 2023, the clerk's office *did* receive from the plaintiff a letter asking for copies (Dkt. No. 103); the clerk of court responded by sending the plaintiff a letter explaining that copies would cost him $0.10 per page, that the fifty-eight copies he requested would cost him $5.80 and that once the court received payment the copies would be mailed to him (Dkt. No. 103-2). Because the court agrees that the plaintiff lacks funds to pay for copies, it will grant the plaintiff's motion and will mail him a copy of his response to the defendants' motion for summary judgment.

## II.    Facts[4]

At the times relevant to the events described in the complaint, the plaintiff was incarcerated at Green Bay Correctional Institution. Dkt. No. 73 at ¶1. The following defendants worked at Green Bay: Scott Eckstein, Warden; Steven Schueler, Deputy Warden; John Kind, Security Director; Stephanie Cummings, Program Supervisor; Jennifer Harris-Forbes, Psychological Associate; and Alan DeGroot, Institution Complaint Examiner. Id. at ¶¶2-7. The following defendants were employed by the Wisconsin Department of Corrections ("DOC"): Emily Davidson, Corrections Complaint Examiner; Jon Litscher, Secretary; Cathy Jess, Deputy Secretary; James Greer, Director of Bureau of Health Services; Cindy O'Donnell (whose position is not identified);

---

[4] Unless otherwise noted, the court includes only material, properly supported facts in this section. See Fed. R. Civ. P. 56(c).

4

and Dr. Marlena Larson, Psychology Director of Bureau of Health Services. <u>Id.</u> at ¶¶8-9.

A.    <u>Badger State Industries and the Dorm</u>

On October 15, 2017, the plaintiff started a working at Badger State Industries ("BSI"); the day before he started the job, he moved into Dorm A. <u>Id.</u> at ¶¶10-11. BSI (now known as the Bureau of Correctional Enterprises) hires incarcerated individuals to provide work skills development through vocational training and experience. <u>Id.</u> at ¶12. At Green Bay, BSI produces clothing, bed sheets, pillows/pillowcases and mattresses for Wisconsin correctional institutions. <u>Id.</u> at ¶13. BSI can hire up to about fifty Green Bay incarcerated persons. <u>Id.</u>

Incarcerated individuals who worked at BSI were housed in Dorm A, an open concept dorm that houses about 117 persons. <u>Id.</u> at ¶14. During the relevant time, based on an administrative decision, all BSI workers had to live in the dorm unless the worker had a unique situation that required him to be placed in a different housing unit, such as the Main Stream Unit ("the MU"). <u>Id.</u> at ¶¶15-16. (The MU is a unit designated for incarcerated individuals who are vulnerable or may be victimized by other incarcerated persons. <u>Id.</u> at ¶17.) It was rare for a BSI worker to be housed outside the dorm. <u>Id.</u> at ¶18. According to the defendants, at the time relevant to this case, there was only one BSI worker housed outside the dorm, and he had special needs that made living in the dorm impractical. <u>Id.</u> at ¶19. The defendants indicate that that worker had been severely injured prior to being incarcerated and "required additional time

to eat, shower, and required special accommodations to function in prison." Id. According to the plaintiff, there was a second individual who worked at BSI but lived in one of the cell halls rather than Dorm A. Dkt. No. 90 at ¶19.

Starting in December 2017, Cummings oversaw Dorm A. Dkt. No. 73 at ¶20. As program supervisor, she was responsible for the security, treatment and general living conditions of all incarcerated individuals assigned to her housing units. Id. The administrative decision to house BSI workers in Dorm A was implemented before Cummings began as program supervisor, and she had no part in making the decision to house BSI workers in Dorm A. Id. at ¶21.

Harris-Forbes was the plaintiff's psychological associate from approximately April 22, 2016 to March 31, 2018, when she moved to a different institution. Id. at ¶22. Her duties included mental health screenings, counseling and mental health monitoring, crisis intervention, individual psychotherapy and psychological assessments to provide mental health services. Id. at ¶23. Harris-Forbes was not responsible for deciding where individuals were housed at the institution. Id. at ¶24.

Just over three months after the plaintiff moved into the dorm—on January 22, 2018—he submitted a psychological service request ("PSR") stating that he was having "major problems" adjusting to living in the dorm, that he feared the individuals living next to him, that someone was going to hurt him and that he wanted to speak with Harris-Forbes as soon as possible. Id. at ¶25. The next day, Harris-Forbes responded that she would meet with the plaintiff as soon as she could, and she advised him to talk with "Security" if he felt

6

another incarcerated individual was going to hurt him. Id. at ¶26. Harris-Forbes did not believe the plaintiff's PSR raised mental health issues that required an immediate appointment. Id. at ¶27. The defendants also indicate that if the plaintiff was concerned that another incarcerated person might harm him, that was a security issue that should have been addressed to security staff. Id. at ¶29.

The same day the plaintiff submitted the PSR—January 22, 2018—he also submitted a health service request ("HSR") complaining about living in the dorm. Id. at ¶30. That HSR was forwarded to the psychological services unit. Id. The next day, Harris-Forbes responded to the HSR stating she would meet with the plaintiff as soon as she could. Id. at ¶31.

On January 30, 2018, Harris-Forbes briefly spoke with the plaintiff in the rotunda of the prison. Id. at ¶32. The plaintiff explained to her that he was having difficulty living in the dorm and had spoken to the program manager about his issues. Id. The plaintiff told Harris-Forbes that he did not want to lose his job at BSI and was considering moving to the MU. Id. Harris-Forbes responded that she would discuss the plaintiff's housing issue with the program manager. Id. Harris-Forbes did not believe the plaintiff qualified to be placed in the MU because "he was able to maintain in the cell hall without issues and although he ha[d] a mental health disorder, he did not present as vulnerable or likely to be victimized via other inmates." Id. at ¶34.

On February 2, 2018, Harris-Forbes emailed Cummings and explained that she had met with the plaintiff in the rotunda on January 30, and that he

described difficulty living in the dorm and had spoken with Cummings. Dkt. <u>Id.</u> at ¶35. Harris-Forbes asked Cummings for her thoughts. <u>Id.</u> Harris-Forbes explained that the plaintiff did not want to lose his job at BSI but that he really did not want to live in Dorm A; she indicated that she believed that all BSI workers lived in Dorm A. <u>Id.</u> at ¶36. Four days later, Cummings responded, telling Harris-Forbes that the plaintiff had not spoken to her about his difficulties in Dorm A and that if individuals wanted to work at BSI, they had to live in the dorm.[5] <u>Id.</u> at ¶37. Cummings mentioned that she was aware of only one individual who worked at BSI and was approved to stay in MU; Harris-Forbes assumed that individual met the requirements for placement in MU, but she did not feel that the plaintiff's situation "was the same." <u>Id.</u> at ¶38. On February 9, 2018, Harris-Forbes sent a memo to the plaintiff explaining that she had spoken with Cummings, and Cummings had stated that incarcerated individuals who worked at BSI were required to live in "the dorms." <u>Id.</u> at ¶39.

On February 22, 2018, Harris-Forbes had a clinical session with the plaintiff during which he described that he was struggling to adapt to living in Dorm A. <u>Id.</u> at ¶40. He said he did not want to lose his job at BSI but he did not feel that he could remain in the dorm. <u>Id.</u> Harris-Forbes's understanding was that the plaintiff was required to remain in the dorm if he wanted to keep

---

[5] The plaintiff states that Cummings is lying when she says that the plaintiff didn't talk to her about the problems he was experiencing while living in the dorm. Dkt. No. 90 at ¶37. The plaintiff avers that he spoke to Cummings "on more than one occasion while on her visits to the dorm to see staff and other inmates." Dkt. No. 92 at ¶22. He doesn't say when he spoke to her.

working at BSI. Id. at ¶41. The two discussed coping mechanisms to help the plaintiff adapt to living in the dorm and making choices such as writing to his sister. Id. The plaintiff reported that there were a couple of incarcerated persons in the dorm he might be able to speak with and use as a support system. Id. He also said that being in the dorm was a conflict with his religion, but that he planned to reach out to a local rabbi regarding visits, support or services. Id. After the visit, Harris-Forbes believed that the plaintiff had several coping mechanisms to help him better adapt to living in the dorm. Id. at ¶42. The defendants assert that the plaintiff also was free to try to move out of the dorm by requesting to be moved either to the MU or to a single cell. Id. at ¶43. Whether the plaintiff could move to the MU or to a single cell was not Harris-Forbes's decision, and she informed him that he would have to request such a move from Cummings. Id. Harris-Forbes did not tell the plaintiff that she supported him in moving to the MU because she did not feel that he met the requirements to live there. Id. at ¶44.

The same day as the plaintiff's session with Harris-Forbes—February 22, 2018—the plaintiff submitted a PSR requesting to be interviewed to live in the MU and asserting that Harris-Forbes recommended the move. Id. at ¶45. Six days later, Harris-Forbes's colleague Dr. Todd Hamilton (not a defendant) responded that Harris-Forbes had not recommended that the plaintiff transfer to the MU but that the plaintiff could write to "those who make that decision." Id. at ¶46. Dr. Hamilton told the plaintiff that Cummings oversaw the dorm

and that she, as well as MU staff, had input as to the plaintiff's possible need and the decision about who resided in the MU. Id.

Also on February 22, 2018 (which he incorrectly dated 2016), the plaintiff submitted a PSR accusing Harris-Forbes of lying to him about being able to provide a "red-tag" for a single cell or move to the MU and that only she could have him moved for psychological issues. Id. at ¶47. The next day, Harris-Forbes responded to the plaintiff, stating that he had not requested a "red tag" or single cell during their appointment. Id. at ¶48. She also informed the plaintiff that he should let her know if he wanted to discuss a single cell with PSU staff and that he could write to the "Single Cell Committee." Id.

On February 27, 2018, the plaintiff submitted a PSR indicating that he had spoken with Cummings, who told him that Harris-Forbes would have to recommend him for a single cell and that Cummings would then approve a single cell. Id. at ¶49. The plaintiff then asked Harris-Forbes to refer him for a single cell. Id. The next day, Harris-Forbes responded that she would take the plaintiff's single cell request to the PSU group to consider whether to make a recommendation to the Single Cell Committee. Id. at ¶50. The PSU group or team is comprised of the psychological services unit clinicians and Harris-Forbes's supervisor. Id. at ¶51. If a clinician wanted to consider recommending an individual be moved to a single cell to the Single Cell Committee (a multi-disciplinary team), the PSU group would discuss and determine whether it was an appropriate referral. Id. Although Harris-Forbes did not support a single cell referral for the plaintiff because she felt that he could remain in the dorm as

10

long as he wanted to keep his job at BSI, she took his request to the PSU group for discussion. Id. at ¶52.

On March 2, 2018, Harris-Forbes sent a memo to the plaintiff informing him that PSU staff had discussed his single cell request and determined that he needed to decide if he was going to keep his BSI job and remain in the dorm or choose to live in the cell hall. Id. at ¶53. Harris-Forbes explained that the PSU team believed the plaintiff would be required to live in the dorm if he continued to work for BSI. Id. She also explained that the plaintiff could write to the Single Cell Committee to request a review. Id.

On March 27, 2018, Harris-Forbes told the plaintiff that she was leaving Green Bay. Id. at ¶54. On March 31, 2018, she left to work for a different institution and had no further contact with the plaintiff. Id. at ¶55.

B.    Administrative Complaints in February and March 2018

On February 7, 2018, the Inmate Complaint Examiner's ("ICE") office received complaint number GBCI-2018-3412. Id. at ¶56 The plaintiff identified his one issue as, "I have mental health conditions which hinder my ability to be around a lot of people. I need to be in a single cell and be able to work at BSI." Id. at ¶57. The plaintiff complained that he should not have to give up the one and only thing he had "going for him" that helped him. Id. DeGroot was assigned as the institution complaint examiner ("ICE") for the complaint, and he investigated the complaint with Cummings. Id. at ¶58. Cummings reported to DeGroot that she had spoken to Harris-Forbes and that they had decided that it was appropriate for the plaintiff to remaining living in Dorm A. Id. at

11

¶60. Based on the information DeGroot learned from Cummings, he felt that the plaintiff's concerns were being addressed by the appropriate staff member and his psychologist and he recommended dismissal of complaint GBCI-2018-3412. Id. at ¶¶61-62. Eckstein, the reviewing authority, agreed with DeGroot's recommendation and dismissed complaint GBCI-2018-3412. Id. at ¶63. The plaintiff did not appeal the dismissal of complaint GBCI-2018-3412. Id. at ¶65.

On March 29, 2018, the ICE office received complaint GBCI-2018-7509. Id. at ¶66. The plaintiff identified his one issue as, "My mental health condition is deteriorating due to being housed in the dorm." Id. at ¶67. The plaintiff complained that his mental health conditions prevented him from adapting to open spaces and being surrounded by lots of people. Id. The plaintiff further complained that he had to choose between working for BSI and living in the dorm or quitting his job and living in the cell halls. Id. After receiving the complaint, DeGroot spoke with Harris-Forbes, who stated that the plaintiff could be housed in the dorms despite his desire to be moved. Id. at ¶68. DeGroot knew that Harris-Forbes was aware of the plaintiff's mental health issues and was "in a position to determine whether he could be housed in the dorm." Id. DeGroot had no reason to doubt Harris-Forbes's expertise in the matter and he recommended dismissal of the plaintiff's complaint. Id. at ¶¶68-69. Larson, as the reviewing authority, agreed with DeGroot's recommendation and dismissed complaint GBCI-2018-7509. Id. at ¶70. Larson noted that the plaintiff's clinician had consulted with other PSU professionals regarding the

12

plaintiff's concerns and "the decision was that [the plaintiff] should remain in the dorms." Id.

The plaintiff appealed the dismissal of complaint GBCI-2018-7509, and Davidson received and acknowledged the appeal. Id. at ¶71. Davidson reviewed the supporting documentation in the record, considered Larson's decision and recommended dismissal of the appeal because the institution's response was reasonable and had been reviewed and decided by Larson, the Bureau of Health Services psychology director. Id. at ¶¶72-73. O'Donnell, from the Office of the Secretary, accepted Davidson's recommendation and dismissed the plaintiff's appeal. Id. at ¶74.

C.    Letter to Eckstein, Schueler and Kind

On April 16, 2018, the plaintiff wrote a letter to Warden Eckstein, Deputy Warden Schueler and Security Director Kind regarding living in the dorm. Id. at ¶83. The letter stated, in relevant part:

> I write this letter to you in hopes that you will be able to provide me with your assistance. I feel as though I am being punished for working at B.S.I by having to live in the Dorm. It is said that, "to live her [sic] in the Dorm-A is a privilege["] but to a lot of inmates including myself, it is a form of punishment. I have spoken to the staff of B.S.I. and I am told that it is the Institution that makes me live here and not B.S.I. I suffer from a lot of mental health issues and my mental health has been deteriorating since being moved over here from the north cell hall. I beg for your assistance in keeping my job at B.S.I. but being moved back to the cell hall, either in a single cell of [sic] a double cell. Please help me.

Id. at ¶84.

Neither Eckstein, Schueler nor Kind were responsible for deciding where incarcerated individuals were housed at the Green Bay. Id. at ¶85. Housing

13

unit supervisors were responsible for housing decisions and Eckstein, Schueler and Kind relied on the housing unit supervisors to make those decisions. Id. at ¶¶85-86. Eckstein, Schueler and Kind each received a high volume of mail from incarcerated individuals: Eckstein received roughly twenty to twenty-five pieces of mail each day, Schueler received six to eight each day and Security Director Kind received forty to fifty each day. Id. at ¶87. When Eckstein, Schueler and Kind received mail from incarcerated persons, they responded to the correspondence or referred it to the most appropriate staff member. Id. at ¶¶88-91.

Eckstein received the plaintiff's letter and referred it to Cummings because, as a housing unit supervisor, it was her responsibility to determine where best to house the plaintiff. Id. at ¶¶95-96. Cummings stated in her response that she had spoken to Harris-Forbes and noted that Harris-Forbes had no concerns with the plaintiff living in Dorm A. Id. at ¶97.

On April 20, 2018, Kind responded to the plaintiff. Id. at ¶98. He stated that he was under the impression that the plaintiff had quit his job with BSI and that his housing would be determined by unit supervisors. Id. Kind noted that the plaintiff had stated in his letter that the plaintiff had addressed his housing concerns with Cummings and Harris-Forbes. Id. at ¶99. Kind expected that if Cummings or Harris-Forbes had determined that it was appropriate for the plaintiff to be housed in the dorm, then that was an appropriate decision based on their roles in determining where to house the plaintiff. Id. at ¶100.

14

On April 27, 2018, Schueler responded to the plaintiff, stating that the institution determines living assignments and that incarcerated individuals who work at BSI would continue to live in Dorm A. Id. at ¶101. Prior to responding, Schueler reviewed Cummings's and Kind's responses and was satisfied that the plaintiff's concerns were addressed so there was no need for him to further review the matter. Id. at ¶102.

Eckstein, Schueler and Kind are not medical professionals, so they had no reason to second guess or doubt the medical judgment of an institution psychologist. Id. at ¶¶103-105. Eckstein and Schueler had no reason to doubt that Cummings appropriately investigated and responded to the plaintiff's letter. Id. at ¶106. Eckstein, Schueler and Kind relied on Cummings and Harris-Forbes regarding where best to house the plaintiff. Id. at ¶108. They do not recall any other interactions with the plaintiff regarding his mental health or desire to be moved out of the dorms. Id. at ¶¶109, 111, 113.

D. Suicide Attempt

According to the plaintiff, on May 28, 2018, when the lights went out in the dorm, he tied a sheet around his neck, stood on a wooden desk and tried to tie the sheet around a metal beam on the wall. Id. at ¶115. Another incarcerated person started yelling and grabbed the plaintiff's legs to prevent him from walking off the desk. Id. Staff members ran to the plaintiff and untied his neck, then placed him in observation status. Id. at ¶116. After spending a day in observation status, the plaintiff was moved to a single cell in segregation

15

for twelve days. Id. at ¶117. After the plaintiff left segregation, he was housed in a single or double cell for the rest of his time at Green Bay. Id. at ¶118.

The plaintiff did not notify anyone that he was suicidal prior to his alleged suicide attempt. Id. at ¶119. When asked during his deposition if he notified staff at any point whether he was suicidal, the plaintiff responded that he had not. Id. The plaintiff testified that he did not suffer any physical injuries due to his suicide attempt. Id. at ¶120. The plaintiff acknowledges that he did not sustain any injuries from his suicide attempt but he states that due to the defendants' action, he has a worse stomach condition and he wants medication for the condition. Dkt. No. 92 at ¶120.

E.    June 2018 Administrative Complaint

On June 7, 2018, the ICE office received from the plaintiff complaint GBCI-2018-12473. Id. at ¶77. The plaintiff identified his one issue as, "I refused moving back to the Dorm where I attempted to hand [sic] myself on 5-28-18. I want to be released from seg, moved to the north cell hall and be allowed to keep my job at the store." Id. at ¶78. The plaintiff complained that he was being punished because he didn't want to live in the dorm. Id. DeGroot rejected the complaint because he had twice before addressed the plaintiff's concerns about being housed in the dorm through the earlier complaints. Id. at ¶¶80-81. The plaintiff did not appeal the rejection of the complaint. Id. at ¶82. The plaintiff asserts that this complaint was different, because even after he'd tried to hang himself, the defendants were trying to move him back to the dorms. Dkt. No. 92 at ¶79. He says this complaint was different because at this

16

point he was in segregation, "trying to be forced to move back to the dorm where he had just attempted to take his life." Id. at ¶80. He asserts that the complaint should not have been rejected. Id. at ¶81.

## III. Analysis

### A. Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Federal Rule of Civil Procedure 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986); Ames v. Home Depot U.S.A., Inc., 629 F.3d 665, 668 (7th Cir. 2011). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." See Anderson, 477 U.S. at 248. A dispute over "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

A party asserting that a fact cannot be, or is, genuinely disputed must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be

17

admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

B. <u>Discussion</u>

To survive summary judgment, the plaintiff must present evidence from which a reasonable jury could find that the defendants knowingly and unreasonably failed to respond to an objectively serious risk of harm. <u>See</u> <u>Farmer v. Brennan</u>, 511 U.S. 825, 844-45 (1994); <u>Wilson v. Adams</u>, 901 F.3d 816, 820 (7th Cir. 2018). "The need for a mental illness to be treated could certainly be considered a serious medical need." <u>Sanville v. McCaughtry</u>, 266 F.3d 724, 734 (7th Cir. 2001). To determine if a prison official acted with deliberate indifference, the court considers his or her subjective state of mind. <u>Wilson</u>, 901 F.3d at 820 (quoting <u>Petties v. Carter</u>, 836 F.3d 722, 728 (7th Cir. 2016), <u>as amended</u> (Aug. 25, 2016)). An official is deliberately indifferent when he or she disregards a known condition that poses "an excessive risk to inmate health or safety." <u>Id.</u> (quoting <u>Dunigan ex rel. Nyman v. Winnebago Cty.</u>, 165 F.3d 587, 590 (7th Cir. 1999)). Mere negligence or medical malpractice is not enough. <u>Id.</u> (citing <u>Petties</u>, 836 F.3d at 728.

When the serious risk at issue is attempted suicide, a defendant acts knowingly and unreasonably if he "(1) subjectively knew the prisoner was at substantial risk of committing suicide and (2) intentionally disregarded the risk." <u>Lisle v. Welborn</u>, 933 F.3d 705, 716–17 (7th Cir. 2019) (quoting <u>Collins v. Seeman</u>, 462 F.3d 757, 761 (7th Cir. 2006)). The defendant "must be cognizant

of the significant likelihood that an inmate may imminently seek to take his own life." Collins, 462 F.3d at 761.

        1.    *Harris-Forbes, Cummings*

The defendants contend that they were not deliberately indifferent to the plaintiff's mental health needs. Dkt. No. 72 at 18. They argue that Harris-Forbes—who was not responsible for deciding where the plaintiff was housed—provided appropriate care to the plaintiff from January 22 to March 27 by conveying the plaintiff's concerns to Cummings and PSU staff and by working with him to develop coping mechanisms to help him adapt to the dorms if he wanted to keep his job; Harris-Forbes believed that the plaintiff could remain in the dorm as long as he wanted to keep his job at BSI. Id. at 19-21. The defendants argue that Cummings reasonably relied on Harris-Forbes's medical judgment that it was appropriate for the plaintiff to remain in the dorm and work on coping mechanisms to deal with the situation. Id. at 21. They also contend that Cummings cannot be liable for the plaintiff's suicide attempt because neither she nor any other staff member knew about the plaintiff's plans to harm himself. Id. at 22.

According to the plaintiff, he repeatedly told Harris-Forbes and Cummings that his mental health was deteriorating, but they did "absolutely nothing" to help him. Dkt. No. 101 at 7. The plaintiff argues that Harris-Forbes's statement that she believed he could cope is self-serving and that because the plaintiff told her that he was suffering from living in the dorm, Cummings's claim that she relied on Harris-Forbes's medical opinion does not

19

absolve her from liability just because she is non-medical personnel. Id. The plaintiff contends that Harris-Forbes and Cummings were deliberately indifferent to his serious mental health condition because he repeatedly told them he was suffering and they chose to leave him in the dorm anyway. Id.

The record does not support the plaintiff's assertion that Harris-Forbes did "absolutely nothing" to help him. The record shows that Harris-Forbes promptly responded to the plaintiff's January 22, 2018 PSR, did not believe he needed emergency mental health services and advised him that if he feared for his safety that he should contact security staff. After speaking with the plaintiff informally on January 30, Harris-Forbes communicated with Cummings about the plaintiff's request to be transferred out of the dorm and keep his job, and she subsequently advised the plaintiff that he would need to remain in the dorm if he wanted to continue working at BSI. When the plaintiff and Harris-Forbes had their clinical session on February 22, 2018, Harris-Forbes provided the plaintiff with coping exercises and strategies and she advised him to talk to Cummings if he wanted to move out of the dorm, although Harris-Forbes did not believe the plaintiff presented with a clinical reason to transfer out of the dorm. Harris-Forbes subsequently asked the PSU group about recommending the plaintiff for a single cell, but that group found that the plaintiff did not qualify for one.

The plaintiff disagrees with Harris-Forbes's opinion that he could remain in the dorm and did not qualify to be transferred to the MU. The plaintiff has not shown, however, that Harris-Forbes's opinion that he could remain in the

dorm was "so blatantly inappropriate as to evidence intentional mistreatment likely to seriously aggravate" his condition. Snipes v. DeTella, 95 F.3d 586, 592 (7th Cir. 1996). The plaintiff's disagreement with Harris-Forbes's opinion that he didn't need to move out of the dorm does not demonstrate that she acted with deliberate indifference. See Pyles v. Fahim, 771 F.3d 403, 409 (7th Cir. 2014) ("Disagreement between a prisoner and his doctor, or even between two medical professionals, about the proper course of treatment generally is insufficient, by itself, to establish an Eighth Amendment violation.") (citing Johnson v. Doughty, 433 F.3d 1001, 1013 (7th Cir. 2006)); see also Snipes, 95 F.3d at 592. Harris-Forbes left Green Bay on March 31, 2018, almost two months *before* the plaintiff's suicide attempt. The plaintiff did not tell her that he was suicidal, and the record does not support a finding that she knew he was at a substantial risk of committing suicide. See Collins, 462 F.3d at 761. A reasonable factfinder could not conclude that Harris-Forbes acted with deliberate indifference.

Cummings advised Harris-Forbes that BSI workers were required to live in the dorm, although she was aware of one individual who lived in the MU but worked at BSI. Cummings followed Harris-Forbes's recommendation that the plaintiff could remain living in the dorm. Again, the plaintiff disagrees with Harris-Forbes's treatment decision that he could remain in the dorm, but he hasn't shown that this decision was unreasonable or that Cummings unreasonably relied on the decision. See Giles v. Godinez, 914 F.3d 1040, 1049 (7th Cir. 2019) ("We have long recognized that the division of labor within a

prison necessitates that non-medical officials may reasonably defer to the judgment of medical professionals regarding inmate treatment."). Although Cummings oversaw the dorm and Harris-Forbes advised the plaintiff that he would have to direct his request to Cummings if he wanted to move from the dorm, Cummings relied on Harris-Forbes's medical opinion that the plaintiff could remain in the dorm. It is undisputed that the plaintiff did not tell Cummings, or any staff members, that he was suicidal, and the record does not support a finding that she knew he was at a substantial risk of committing suicide. See Collins, 462 F.3d at 761. A reasonable factfinder could not conclude that Cummings acted with deliberate indifference.

2.    *DeGroot, O'Donnell, Davidson, Larson*

The defendants contend that DeGroot, O'Donnell, Davidson and Larson properly addressed the plaintiff's administrative complaints and that there is no evidence that they were deliberately indifferent in relying on Harris-Forbes's medical judgment that he could be housed in the dorm. Dkt. No. 72 at 23-24. The plaintiff contends that DeGroot, O'Donnell, Davidson and Larson are liable because they refused to give him the proper mental health care he needed. Dkt. No. 101 at 7. According to the plaintiff, he followed the chain of command, starting with Harris-Forbes; all the defendants relied on what Harris-Forbes said, but "it was evident that [the plaintiff] was not satisfied with the course of treatment that Harris-Forbes was providing and that is why he went to her superiors." Id. The plaintiff states that the constitutional violations should have been stopped through administrative complaint process, but they were not. Id.

22

"Ruling against a prisoner on an administrative complaint does not cause or contribute to the [constitutional] violation." George v. Smith, 507 F.3d 605, 609 (7th Cir. 2007). The plaintiff contends that because his grievances—which showed that he was not satisfied with the treatment he was receiving from Harris-Forbes—should have alerted these defendants to ongoing violations that they should have stepped in to address. The court has determined that Harris-Forbes's actions do not give rise a valid deliberate indifference claim, which means the plaintiff cannot maintain a claim against these defendants for failing to prevent Harris-Forbes's conduct. See id. Moreover, these defendants were entitled to defer to Harris-Forbes's treatment decisions, because she was a medical professional. See Greeno v. Daley, 414 F.3d 645, 657 (7th Cir. 2005). The court will grant the defendants' motion for summary judgment as to DeGroot, O'Donnell, Davidson and Larson.

3. *Litscher, Jess, Greer*

The defendants assert that Litscher, Jess and Greer had no personal involvement in the alleged constitutional deprivations. Dkt. No. 72 at 25-26. The plaintiff contends that they were personally involved in the constitutional deprivations because he went through the proper chain of command, but no one stopped his suffering. Dkt. No. 101 at 8-9. The plaintiff also alleges that the defendants have a policy/practice of denying incarcerated individuals proper mental treatment because they do not believe the individuals' claims that they are suffering due to a situation in prison. Id. at 9

23

Section 1983 limits liability to public employees who are personally responsible for a constitutional violation. Burks v. Raemisch, 555 F.3d 592, 595-96 (7th Cir. 2009). For liability to attach, the individual defendant must have caused or participated in a constitutional violation. Hildebrandt v. Ill. Dep't of Nat. Res., 347 F.3d 1014, 1039 (7th Cir. 2003). Regarding supervisors, the personal responsibility requirement is satisfied if the constitutional deprivation occurs at the supervisor's direction or with the supervisor's knowledge and consent. Id. In other words, the supervisor "must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye." Id. (quoting Gentry v. Duckworth, 65 F.3d 555, 561 (7th Cir. 1995)).

The record does not support a finding that these defendants had any involvement in, or knowledge of, the decline of the plaintiff's mental health condition while he lived in the dorm. Even if they knew about the plaintiff's situation, there is no underlying constitutional violation by the individuals who were involved in the plaintiff's requests to leave the dorm. See George, 507 F.3d at 509. Finally, the plaintiff's contention that the defendants had a policy of denying treatment to incarcerated individuals is conclusory; the record does not support a finding that the defendants had such a policy or practice. See Monell v. Dep't of Soc. Servs. of City of New York, 436 U.S. 658 (1978); Lapre v. City of Chicago, 911 F.3d 424, 430-31 (7th Cir. 2018); Bd of Cty. Comm'rs of Bryan Cty., Okla. V. Brown, 520 U.S. 397, 403 (1997). Even if the plaintiff could proceed on a claim against the defendants based on a policy or practice, any such claim would be limited to injunctive relief and, because the plaintiff is

24

no longer housed in the dorm, likely would be moot. See Kentucky v. Graham, 473 U.S. 159, 169 (1985). The court will grant the defendants' motion for summary judgment as to Litscher, Jess and Greer.

4. *Eckstein, Schueler, Kind*

The defendants argue that Eckstein, Schueler and Kind reviewed and appropriately responded to the communications the plaintiff sent them.[6] Dkt. No. 106 at 3. The defendants contend that neither Eckstein, Schueler or Kind were responsible for deciding where incarcerated individuals are housed, they relied on staff to make such decisions and they relied on the decisions of Cummings and Harris-Forbes on where best to house the plaintiff. Id. at 3-4. The defendants contend that these actions were not deliberately indifferent to the plaintiff's mental health needs. Id. at 4.

It is undisputed that Eckstein referred the plaintiff's letter to Cummings, the appropriate staff member to respond to the letter, and that she stated that she had spoken with Harris-Forbes who did not have concerns with the plaintiff living in the dorm. Kind noted that the plaintiff stated in his letter that he had addressed his housing concerns with Cummings and Harris-Forbes, and he expected that if they had determined that the plaintiff could be housed in the dorm, then that was an appropriate decision. Likewise, Schueler

---

[6] The defendants say that they mistakenly left out from the argument section of their summary judgment brief a discussion of Eckstein, Schueler and Kind, although facts about their involvement were included in the brief. Id. at 3 n.1. They include the argument in their reply brief. Id. The defendants stated that they would not oppose a request by the plaintiff to file a sur-reply to address these defendants. Id. The plaintiff did not file a sur-reply or ask to do so.

responded to the plaintiff's letter; he said that the institution determined living assignments and, after reviewing Cummings's and Kind's responses, he believed that the plaintiff's concerns had been addressed. Eckstein, Schueler and Kind appropriately relied on staff to address the plaintiff's concerns. See Burks v. Raemisch, 555 F.3d 592, 595 (7th Cir. 2009) ("Bureaucracies divide tasks; no prisoner is entitled to insist that one employee do another's job. The division of labor is important not only to bureaucratic organization but also to efficient performance of tasks; people who stay in their roles can get more work done, more effectively, and cannot be hit with damages under §1983 for not being ombudsman."). The court will grant the defendants' motion for summary judgment as to Eckstein, Schueler and Kind.

In sum, a reasonable factfinder could not conclude that the defendants violated the plaintiff's constitutional rights. The court will grant the defendants' motion for summary judgment. Because the court has dismissed the plaintiff's claims on the merits, it need not address the defendants' contention that they are entitled to qualified immunity.

## IV.  Conclusion

The court **GRANTS** the defendants' motion for summary judgment. Dkt. No. 71.

The court **GRANTS** the plaintiff's motion to obtain copies of all documents filed in opposition to motion for summary judgment. Dkt. No. 107. Along with this order, the court will mail the plaintiff a copy of his response to defendants' motion for summary (Dkt. Nos. 88-90, 92-98, 101).

26

The court **GRANTS** the plaintiff's motion to have signature added. Dkt. No. 108. The court **ORDERS** that the Clerk of Court must add the plaintiff's motion at Dkt. No. 108 as a signature page to the plaintiff's proposed findings of fact and motion of opposition to defendants' motion for summary judgment (Dkt. Nos. 89, 90, 92).

The court **ORDERS** that this case is **DISMISSED**. The clerk will enter judgment accordingly.

This order and the judgment to follow are final. A dissatisfied party may appeal this court's decision to the Court of Appeals for the Seventh Circuit by filing in this court a notice of appeal within thirty days of the entry of Judgment. See Federal Rule of Appellate Procedure 3, 4. This court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the thirty-day deadline. See Fed R. App. P. 4(a)(5)(A).

Under limited circumstances, a party may ask this court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Rule 59(e) must be filed within twenty-eight days of the entry of judgment. The court cannot extend this deadline. See Fed. R. Civ. P. 6(b)(2). Any motion under Rule 60(b) must be filed within a reasonable time, generally no more than one year after the entry of the judgment. The court cannot extend this deadline. See Fed. R. Civ. P. 6(b)(2).

The court expects parties to closely review all applicable rules and determine, what, if any, further action is appropriate in a case.

Dated in Milwaukee, Wisconsin this 15th day of September, 2023.

BY THE COURT:

**HON. PAMELA PEPPER**
**Chief United States District Judge**